UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| PERRY MAY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 1:06CV129 HEA |
| | ) |
| PRATT INDUSTRIES (U.S.A.), INC., | ) |
| | ) |
| Defendant. | ) |

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment, [Doc. No. 26]. Plaintiff opposes the motion. For the reasons set forth below, the Motion is granted.

## Introduction

Plaintiff filed this action against Defendant alleging Retaliatory Discharge, (Count I); Breach of Contract and Covenant of Good Faith, (Count II); Promissory Estoppel, (Count III); and Tortious Interference with Business Relationship, (Count IV).[1] Defendant moves for Summary Judgment on Counts I, II and III.

## Facts and Background

---

[1] This Count was brought against Signature Packing & Paper, LLC only. On January 25, 2008, the Court granted Plaintiff's Motion to Dismiss Signature Packing. Accordingly, this Count no longer remains viable.

Defendant is a paper and packaging company that, among other things, produces and sells cardboard boxes. Typically, Defendant's customers are other companies that use the boxes to package and ship their products. Defendant operates a production facility in Humboldt, Tennessee, and has its headquarters in Conyers, Georgia. Defendant operates manufacturing facilities in more than twenty states.

Plaintiff was hired as a local plant salesperson for the Humboldt, Tennessee location in November, 2002, by Bob Graning. At the time he was hired, Plaintiff was working as a General Manager for Jerry Lipps, Inc. in Cape Girardeau, Missouri.

Plaintiff's total income during the two and one half years he worked at Jerry Lipps, Inc. was $40,961 in 2000; $46,952 in 2001; $52,108 in 2002. He was also given bonuses during his employment at Jerry Lipps, Inc.

Plaintiff was hired to make sales for Defendant in the Southeastern Region of Missouri working and living in the same area in which he lived while working for Jerry Lipps, Inc. Graning offered Plaintiff a job with an annual salary of $55,000, 2% commission for all new business as well as for any increased business on existing accounts, a $900 per month car allowance, expense reimbursement and car maintenance reimbursement. There was no discussion of the manner in which the

commissions would be calculated.

Plaintiff accepted Graning's offer. There was no written document at the time of this acceptance. The parties did not discuss the duration of Plaintiff's employment. Plaintiff believed the duration to be indefinite. Neither party discussed at this time the reasons for which either party could terminate the employment.

Plaintiff typically worked with "local" accounts, which are generally smaller customers that would buy from only one of Defendant's manufacturing locations. Sales to these local accounts were handled exclusively by local plant sales people and other representatives from the Humboldt location.

Defendant also services "national" accounts, which are generally larger customers that have the potential to provide business to several of Defendant's manufacturing locations.

Plaintiff was placed on probation in May, 2004. At that time, Plaintiff was informed that he would not receive commissions if he failed to sell at least $50,000 in gross revenue per month. Plaintiff was not told until sometime after certain Procter & Gamble, (P&G), accounts were awarded that the sales under the P&G contract would not be included in calculating his gross sales per month.

Around this time, Plaintiff alleges that two of his sales managers in Humboldt,

Mike Tansy and Matt Melzer, told him his "job was safe" as long as his sales were $50,000 per month.

Through Plaintiff's previous employment, Plaintiff had contacts with a local P&G plant in Cape Girardeau, Missouri. Plaintiff obtained contact information for Pete Patti, a P&G representative in Cincinnati, Ohio, who was one of the decision makers with respect to choosing the provider for box materials at the Cape Girardeau plant. Through his contacts, Plaintiff arranged for a meeting with two corporate representatives at P&G's headquarters in Cincinnati, Ohio, in September, 2004. Tansy and Meltzer joined plaintiff in Cincinnati for this meeting. These efforts dealt with P&G's family and baby care products division.

Plaintiff testified in his deposition that he was not aware of any solicitation by Defendant of P&G business prior to Plaintiff's efforts to obtain the business from the Cape Girardeau P&G facility. At this time, other efforts to obtain business from P&G were being made by other employees of Defendant. These efforts dealt with P&G's snack division business, and business for other Pratt locations in the country.

Plaintiff's direct supervisor in the months leading up to the P&G award was Matt Meltzer. Meltzer knew that Plaintiff was actively pursuing the P&G business and he supported Plaintiff's efforts in that regard. Meltzer told Plaintiff not to worry

about new business and just concentrate on P&G. In late 2004, 2005, Plaintiff was told by Meltzer and Tansey, Plaintiff's former supervisor, that his job was safe if he met the monthly sales requirement. Furthermore, once the P&G business was acquired, Meltzer told Plaintiff that his job was no longer in jeopardy.

In February, 2005, Defendant was awarded business for the P&G family and baby care division and the snack division. P&G withdrew its family care business in April, 2006. A final contract with P&G was signed in February, 2007.

Plaintiff worked the P&G account as the local plant salesperson to service the family and baby care portion in Cape Girardeau. Other employees of Defendant had responsibilities with respect to the P&G account as well. Plaintiff was paid a one percent (1%) commission on the sales which took place under the P&G Cape Girardeau contract. Additionally, Plaintiff was told that the sales to the P&G account would not count toward the $50,000 per month threshold, and that he still must sell this amount in order to receive two percent (2%) commission on these sales. After the acquisition of the P&G business, Plaintiff's monthly sales always averaged over $50,000. The average of Plaintiff's monthly sales over the 21 month period between September, 2004 and May, 2006 is $459,992.

Subsequent to the award of business from P&G, Defendant still had to satisfy P&G's production qualification requirements, referred to as the "qualification

phase." During the qualification phase, around July or August, 2005, Defendant was in short supply of a weight of paper used to manufacture the boxes it was selling to P&G. Defendant used a different weight of paper instead, but did not inform P&G of the change. Plaintiff claims that Mr. Confer told Plaintiff of the change, but then told him not to tell P&G. Plaintiff further claims that he then told representatives of the P&G plant in Cape Girardeau almost immediately after he learned of the change. After Plaintiff told the representatives of the change, Plaintiff, along with representatives for P&G, called Confer to discuss the problem.

At the end of March, 2006, Greg Ketron was hired as the new sales manager at Defendant's Humboldt facility. Almost immediately after Ketron began working in his new role, he began evaluating his existing sales force, including Plaintiff. Ketron reached the conclusion that Plaintiff's sales performance was below expectation. Ketron detailed his evaluation in a letter to Plaintiff on April 5, 2006 and demanded immediate improvement.

Ketron decided to discharge Plaintiff, effective April 28, 2006. Ketron testified that he was the only individual involved in making the decision to terminate Plaintiff's employment, however, he had discussed Plaintiff's performance with Keith Toney and Bob Graning. Ketron also testified that he was completely unaware of Plaintiff's report to P&G.

Plaintiff testified that he believed that his discharge was partially based on Defendant not wanting to pay him his commissions on the P&G business.

## Discussion

The standards for summary judgment are well settled. In determining whether summary judgment should issue, the Court must view the facts and inferences from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Woods v. DaimlerChrysler Corp.,* 409 F.3d 984, 990 (8th Cir. 2005); *Littrell v. City of Kansas City, Mo.,* 459 F.3d 918, 921 (8th Cir. 2006). The moving party has the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Enterprise Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in his pleadings but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed.R.Civ.P. 56(e); *Anderson* 477 U.S. at 256; *Littrell ,* 459 F.3d at 921. "The party opposing summary judgment may not rest on the allegations in its pleadings; it must 'set forth specific facts showing that there is a genuine issue for trial.'" *United of Omaha Life*

*Ins. Co. v. Honea,* 458 F.3d 788, 791 (8th Cir.2006) (quoting Fed.R.Civ.P. 56(e)); "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)." *Hitt v. Harsco Corp.,* 356 F.3d 920, 923 (8th Cir. 2004). An issue of fact is genuine when "a reasonable jury could return a verdict for the nonmoving party" on the question. *Anderson,* 477 U.S. at 248; *Woods,* 409 F.3d at 990. To survive a motion for summary judgment, the "nonmoving party must 'substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy.' *Wilson v. Int'l Bus. Machs. Corp.*, 62 F.3d 237, 241 (8th Cir. 1995)(quotation omitted)." *Putman v. Unity Health System*, 348 F.3d 732, 733-34 (8th Cir. 2003). A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor. *Wilson v. Int'l Bus. Mach. Corp.,* 62 F.3d 237, 241 (8th Cir.1995). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. 242 at 252; *Davidson & Associates v. Jung* 422 F.3d 630, 638 (8th Cir. 2005). Summary Judgment will be granted when, viewing the evidence in the light most

favorable to the nonmoving party and giving the nonmoving party the benefit of all reasonable inferences, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Samuels v. Kansas City Mo. Sch. Dist.,* 437 F.3d 797, 801 (8th Cir. 2006). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Thomas v. Corwin,* 483 F.3d 516, 526-7(8th Cir. 2007).

**Breach of Contract and Covenant of Good Faith[2]**

Plaintiff recognizes that at the beginning of his employment, no contract of employment existed. He does, however, argue that subsequent to being hired, the notice of probation he received during his employment constitutes an employment contract. As Defendant correctly points out, the Missouri Supreme Court[3] has specifically held that a notice of probation in no way establishes a contract of employment:

---

[2] In an effort to systematically address the arguments presented, the Court will discuss the issues in the order discussed by Plaintiff rather than in the order in which the various causes of action are raised in the Petition. It appears to the Court that Plaintiff's action is brought in the alternative, since the finding of an employment contract precludes recovery of a retaliatory discharge claim.

[3] State law governs the substance of this diversity-based action. *Erie R.R. v. Tompkins,* 304 U.S. 64, 78 (1938); *Pritchett v. Cottrell, Inc.* 512 F.3d 1057, 1063 (8th Cir. 2008).

> The essential elements of a valid contract include offer, acceptance, and bargained for consideration. *Thacker v. Massman Construction Co.,* 247 S.W.2d 623, 629 (Mo.1952); *National Refining Co. v. McDowell,* 201 S.W.2d 342, 347 (Mo.1947); *Restatement of Contracts 2d Section 17* (1981). None of these elements are present in this case.
>
> \* \* \* \* \* \* \* \* \*
>
> Plaintiff . . . contends that a valid contract, altering her at will status, was created by [Defendant's] August 16 probation notice. Once again, however, the elements of contract formation are lacking. The probation notice was an unilateral expression of [Defendant's] intention to discharge plaintiff if she failed to meet certain conditions. This Court concludes that the probation notice issued by [Defendant] failed to create a valid contract of employment and plaintiff remained an at will employee.

*Johnson v. McDonnell Douglas Corp.,* 745 S.W.2d 661 (Mo.,1988). Likewise, Defendant's Performance Review fails to satisfy the necessary elements of an enforceable employment contract. It was a unilateral expression of Defendant's intention to discharge Plaintiff if he failed to meet certain conditions. Plaintiff's breach of contract and therefore, his claim of a breach of the covenant of good faith and fair dealing, must fail. (*Bishop v. Shelter Mut. Ins. Co.*, 129 S.W.3d 500, 506 (Mo.App. 2004) ("T]he Missouri employment at-will doctrine expressly prohibits any consideration of the implied covenant of good faith and fair dealing (inherent in all contracts) when an employer is sued for terminating the employee."); *Kelly v.*

*State Farm Mut. Auto. Ins. Co.* 218 S.W.3d 517, 524 (Mo.App. W.D.,2007); *Lyles v. Columbia Public School Dist.,* 2007 WL 1485873, 3 (W.D. Mo. 2007).

Plaintiff attempts to establish an employment contract through his claims of consideration that he resigned from his former employer. This is, however, the sort of consideration normally associated with the performance of services for an employer, and as such does not remove plaintiff's at will status. In rejecting a similar argument, the court in *Minter v. Tattle-Campbell Dry Goods Co.*, 173 SW. 4, 8 (Mo.App.1915) stated:

> The effort of plaintiff to show an additional consideration passing from him to defendant was abortive, since it shows that he merely abandoned other activities and interests to enter into the service of defendant-a thing almost every desirable servant does upon entering a new service, but which, of course, cannot be regarded as constituting any additional consideration to the master.

*Rosatone v. GTE Sprint Communications,* 761 S.W.2d 670, 672 (Mo.App. E.D. 1988).

**Retaliatory Discharge**

In Missouri, employees without employment contracts, as articulated above, are considered at-will employees and can be terminated with or without cause. *Porter v. Reardon Mach. Co.*, 962 S.W.2d 932, 937 (Mo.App. 1998) (citing *Johnson v. McDonnell Douglas Corp.*, 745 S.W.2d 661, 662 (Mo.1988)). Missouri

courts, however, have recognized a public policy exception to the at will employment doctrine. *Luethans v. Washington Univ.*, 838 S.W.2d 117, 119 (Mo. App.1992). This public policy exception, like the doctrine itself, is confined to at-will employees. *Egans v. Wells Fargo Alarm Servs.*, 23 F.3d 1444, 1446 (8th Cir.1994) (citing *Komm v. McFliker*, 662 F.Supp. 924, 924-25 (W.D.Mo. 1987)). Accordingly, contract employees, those employed for a "definite term" and who cannot be discharged without just cause, have no state law cause of action for wrongful discharge. *Egans*, 23 F.3d at 1446.

The public policy exception to employment-at-will is a narrow one. *Lynch v. Blanke Baer & Bowey Krimko, Inc.*, 901 S.W.2d 147, 150 (Mo.App.1995). Missouri courts have outlined four categories of public-policy exceptions: (1) discharge of an employee because of his or her refusal to perform an illegal act; (2) discharge because an employee reported violations of law or public policy to superiors or public authorities; (3) discharge because an employee participated in acts that public policy would encourage, such as jury duty, seeking public office, asserting a right to collective bargaining, or joining a union; and (4) discharge because an employee filed a worker's compensation claim. *Id.*, citing, *Boyle v. Vista Eyewear, Inc.*, 700 S.W.2d 859, 873-75 (Mo.App.1985). Furthermore, the exception must be established by substantial evidence. *Lynch*, 901 S.W.2d at 150.

Moreover,

> [t]o prevail on a claim of wrongful discharge, the plaintiff must prove that the employer discharged the plaintiff because plaintiff "reported to superiors or to public authorities serious misconduct that constitutes a violation of the law and of ... well established and clearly mandated public policy." *Loomstein v. Medicare Pharmacies, Inc.,* 750 S.W.2d 106, 112 (Mo.App.1988) (citing *Boyle,* 700 S.W.2d at 878). To meet his burden, plaintiff here must present evidence to establish an exclusive *causal connection* between his discharge and reporting violations to either his superiors or to public authorities. *See Loomstein,* 750 S.W.2d at 112-13.

*Lynch,* 901 S.W.2d at 150.

Plaintiff argues that he was discharged from his employment because he disclosed the unilateral change in the weight of cardboard used by Defendant in manufacturing the boxes for P&G. Even assuming this disclosure falls within the recognized "public policy" categories, Plaintiff's claim cannot survive. The record before the Court establishes that Ketron was the sole decision maker with respect to Plaintiff's termination. Ketron testified that he had no knowledge of Plaintiff's report of the different cardboard. While Plaintiff attempts to establish that Ketron *must have known* of the report because he spoke with Toney and possibly Graning, such speculation is insufficient to overcome Defendant's motion and is, in any event belied by the record. There is absolutely no evidence that Ketron knew of this report.

Furthermore, Plaintiff's own testimony resolves the issue against him. Plaintiff testified that he was discharged because Defendant simply did not want to pay him the commissions on the P&G sales. As such, Plaintiff cannot establish that the *exclusive* reason for his discharge was in retaliation for Plaintiff having disclosed the inferior cardboard.

**Promissory Estoppel**

Because Plaintiff has failed to establish a valid employment contract, he cannot use promissory estoppel to recover against Defendant. *Clark v. Washington Univ.*, 906 S.W.2d, 789, 792 (Mo.App. 1995).

> The essential elements of a claim of promissory estoppel are: a promise, detrimental reliance on the promise in a way in which the promisor should have or did foresee, and an injustice which can only be avoided by enforcement of the promise. *Townes v. Jerome L. Howe, Inc.,* 852 S.W.2d 359, 360[4] (Mo.App.1993). An employee must prove his employer made a promise in a contractual sense and may not use promissory estoppel to recover against a former employer where an employment contract could not be proven. *Mayer v. King Cola Mid-America, Inc.,* 660 S.W.2d 746, 749 (Mo.App.1983); *Danella Southwest, Inc. v. Southwestern Bell Telephone Co.,* 775 F.Supp. 1227, *aff'd* 978 F.2d 1263.

### Conclusion

Plaintiff has failed to satisfy his burden requiring that he establish a genuine issue of material fact. As such, Defendant is entitled to judgment as a matter of law.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment, [Doc. No. 26], is **GRANTED**.

A separate judgment in accordance with this Memorandum and Order is entered this same date.

Dated this 16th day of April, 2008.

                                              HENRY EDWARD AUTREY
                                      UNITED STATES DISTRICT JUDGE